IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 29, 2019 Session

## ROBERT ANDREW HAWKINS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Claiborne County**
**No. 17-CR-2776      E. Shayne Sexton, Judge**

_____

### No. E2018-01682-CCA-R3-PC

_____

A Claiborne County jury convicted the Petitioner, Robert Andrew Hawkins, of one count of aggravated kidnapping and two counts of aggravated assault, and the trial court sentenced him to an effective sentence of sixteen years in confinement. The Petitioner appealed his convictions on the basis of a juror issue and sentencing. This court affirmed his convictions and sentence. *State v. Robert Andrew Hawkins*, No. E2015-01542-CCA-R3-CD, 2016 WL 5210770 (Tenn. Crim. App, at Knoxville, Sept. 19, 2016), *perm. app. denied* (Tenn. Dec. 14, 2016). The Petitioner filed a timely petition for post-conviction relief in which he alleged that: (1) the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 93 (1965); (2) Counsel was ineffective for failing to investigate or communicate effectively with him; and (3) the cumulative effect of these errors entitles him to a new trial. The post-conviction court denied relief, and the Petitioner maintains his allegations on appeal. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, P.J. and ROBERT L. HOLLOWAY, JR., J., joined.

Chelsea C. Moore, Knoxville, Tennessee, for the appellant, Robert Andrew Hawkins.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Jared R. Effler, District Attorney General; and Graham E. Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

In our opinion affirming the Petitioner's convictions, we summarized the

Petitioner's case as follows:

> Four days after the victim, Anna Falce, required her live-in boyfriend, [the Petitioner], to vacate her home, he returned, held her hostage for over three hours, and viciously attacked her. As a result of the attack, the Claiborne County Grand Jury indicted [the Petitioner] for aggravated burglary in count one, especially aggravated kidnapping in count two, aggravated domestic assault in counts three and four, and coercion of a witness in count five. After a trial, [the Petitioner] was acquitted in counts one and five, convicted of the lesser included offense of aggravated kidnapping in count two, and convicted of aggravated assault in counts three and four.

*Hawkins*, 2016 WL 5210770, at *1. Because the Petitioner had not appealed sufficiency of the evidence, our summary did not include the facts presented at trial. Those facts, however, are relevant herein based upon the Petitioner's argument that Counsel's representation prejudiced him at trial. Therefore, we turn to summarize the facts as presented at trial.

### A.    Trial

During the Petitioner's trial, the parties presented the following evidence: The victim testified that she was living in a home with her daughter on April 24, 2013, a home from which she had recently asked the Petitioner to vacate. The two had dated for four years, and she broke off their relationship and asked him to move out. The Petitioner refused, and the victim had to go to a friend's house, hide her vehicle, and then threaten him with calling the police before he would leave. The home was owned by the victim's mother, where she had lived since 2001, and the victim paid her $100 a month to live there. While the Petitioner shared some expenses, he did not pay rent.

On April 24, 2013, the day of the attack, the victim's daughter, I.R., had a friend over. I.R.'s friend's father, Tim Brantley, picked them up to drive them to school. The victim said she was preparing for work as a supervising nurse and was expecting a friend, Mindy Walker. When the victim heard someone come in the door, she assumed it was Ms. Walker, but it was the Petitioner. He said "I hope you kissed your daughter goodbye because that's the last time you're gonna see her."

The victim said that the Petitioner grabbed her and threw her on the ground and then punched her. The Petitioner called her a "whore," dug through her bathroom trash looking for dirty condoms, and told her that she did not deserve to live. The Petitioner told her that he had been standing outside her window waiting for I.R. to leave. The

2

Petitioner then told her that if she did not stay with him that he would kidnap, torture, and kill her.

The victim testified that the Petitioner then got on top of her and strangled her until she could no longer breathe. He repeatedly slammed her head onto the floor. As he loosened his grip on her neck, she began screaming, and he told her that she was not going to scream anymore. He put his fingers in her throat, and made a large hole in the back of her gum with his finger. The victim said that, at one point, she fled and made it to her carport before the Petitioner grabbed her by the hair and "jerked" her into the house.

The victim said that she tried to hit the Petitioner with a vase, but she had no strength. He said that he was going to tape her up because she was not cooperating. He then got duct tape from a toolbox, hit her in the head with the vase, and taped her hands and feet. The Petitioner kept smacking her face and told her that he had decided to kill himself but then he decided that killing her would be more fun. The Petitioner told her that his father was going to testify that the two were together at the time of the murder so he would not be caught. The victim said that the Petitioner told her that he was going to put her in his car, go get I.R. from school, and let I.R. watch while he tortured and killed the victim. He also said he was going to call the victim's mother and let her listen to the victim being killed.

The victim said that the Petitioner began looking through her work and personal cell phones. He kicked her any time he saw something that he did not like on her phone, such as a text message from someone who he assumed was a male. The Petitioner sent and received text messages from the victim's phone during this ordeal, but she did not have access to her phones at this point. As the Petitioner looked at her phones, he accused the victim of sleeping with other men, put his face by her "lower area" and said that she smelled like another man's "dick." The victim said that she was in the process of changing when the Petitioner arrived, so she did not have any pants or underwear on during these events.

Mr. Brantley returned from taking the girls to school, bringing the victim breakfast. The Petitioner taped the victim's mouth, told her that he would kill her if she made a sound, and went outside and yelled at Mr. Brantley that the victim was not there and that Mr. Brantley should leave. The victim said that, when the Petitioner came back into the house, he ripped the duct tape off of the victim's mouth. Her lip ripped away from one side of her mouth. She said that there was blood in her throat from where the Petitioner punctured it with his finger and she could barely breathe when her mouth and nose were taped.

3

The victim said that she convinced the Petitioner to let her call her work and inform them that she was unable to come to work. When she did so, the person whom she called knew that there was something wrong, so she had the victim's boss, Dana Schaaf, call her to confirm her absence. When the Ms. Schaff called her, the victim gave her a "code word," which let her Ms. Schaff know that there was something wrong.

The victim said that the Petitioner began rocking in a chair and asked her if he had fallen asleep. She told him no, but she became aware that he was on drugs. The Petitioner told her that he had taken "Mollie" that weekend and then had gone to his night shift as a coal miner. The victim said that she began talking to the Petitioner about his mother and about how maybe the two of them could work things out in an attempt to calm him down. The victim asked the Petitioner to cut the tape on her hands, and he agreed. She then cut the tape on her feet.

The victim testified that, at that point, the Petitioner said that he was going to take a brief rest but that if she tried "anything" he would kill her. The victim said that, as the Petitioner rested, she called Ms. Walker who arrived shortly thereafter. The victim convinced the Petitioner to let Ms. Walker in, saying if he did not that Ms. Walker would call the police. When Ms. Walker saw the victim, she asked the Petitioner what he had done to her and handed the victim some pants from a clothing pile nearby. The Petitioner acted remorseful. Ms. Walker repeatedly asked the Petitioner what he had done, and he became incensed. He went to the back bedroom, called the victim to him, and told her to "get rid" of Ms. Walker. The victim reminded him that three people had seen him there that day, Mr. Brantley, Ms. Walker, and herself, and the Petitioner said he had time to kill all three. The victim agreed to ask Ms. Walker to leave, and the victim left the room, began running, told Ms. Walker to leave, and then fled the house herself.

The victim said that she ran to Jack Creech's garage and called 911. From the garage, she saw the Petitioner leave her driveway in his green Bravada SUV. The victim said that she did not see the Petitioner again until his first court date regarding these events. Before the Petitioner was apprehended, however, the police asked her to keep texting with the Petitioner because they were tracking his cell phone. The Petitioner told the victim via text that he could be behind her house again at any minute.

The victim described her injuries from this attack, which the police photographed. She said the pictures depicted her neck, which was swollen and red from the strangulation; her hair, which was ripped out; her injured lip, and her black eyes. The victim also identified photographs of bruises to her legs, arms, elbows, and kidney area from the Petitioner kicking her. Not pictured were her punctured gum and the injury from him smashing the vase on top of her head.

The victim identified photographs taken of the text messages the Petitioner sent from the victim's phone to Ms. Walker. In one of the text messages, Ms. Walker asked if the victim was alright, saying that Mr. Brantley was worried about her. The Petitioner responded as the victim saying that she was fine and was talking to the Petitioner who was upset. Ms. Walker then asked the victim via text whether she was okay, and the Petitioner responded as the victim that she was fine and just arguing with the Petitioner.

The victim also identified pictures of text messages between the Petitioner and herself before he turned himself in to the police. In those messages, the Petitioner told the victim that he had heard that she said he was on "bath salts" and had kidnapped her, both of which he stated were untrue. He texted that he had lived with her for five years, the two had argued, and so he went to stay with his father for three days. He accused her of allowing another man to stay with her during this time. He told her that the lies she had said about him had caused him to lose his job and leave town. Other text messages became more threatening, with the Petitioner telling the victim that he was "closer to [her] than [she] would ever think."

During cross-examination, the victim testified that she and the Petitioner had agreed that he would move out but that he would sleep on the couch until he earned money to do so. The victim agreed that the Petitioner knew that she kept a firearm in the house but that he did not attempt to obtain it and use it against her.

Mr. Brantley testified and confirmed that he took the victim's daughter and his own daughter to school and then returned with breakfast for the victim. When she did not answer the door, he assumed that she had fallen asleep. The Petitioner, who appeared "mad," then answered the door and informed Mr. Brantley that the Petitioner and the victim were reconciling and that Mr. Brantley should leave. Mr. Brantley left and went to Ms. Walker's house and told her that the Petitioner was at the victim's house and that Ms. Walker should check on the victim. Ms. Walker texted the victim, who responded that she and the Petitioner were arguing but that they were working things out and that she was fine.

Ms. Walker testified and confirmed the victim's and Mr. Brantley's testimony about the events of April 24, 2013. Ms. Walker added that, when she arrived at the victim's home, the victim looked as if she had been "beaten up." She had bruising around her face, blood on her cheek, and marks on her arms. The victim had a shirt on and a blanket wrapped around her but was wearing no other clothing. Ms. Walker said that she was terrified and also scared for the victim. Ms. Walker said she asked the Petitioner why he had beaten up the victim, and the Petitioner said that he was upset and became remorseful, saying he had never done anything like that before. Ms. Walker told the Petitioner that there was no excuse for his behavior, and he seemed to become angry

5

again. Ms. Walker confirmed that the Petitioner went into a back bedroom, called the victim into the room, and shortly thereafter the victim fled the home telling Ms. Walker to leave also.

Dana Schaaf, the victim's supervisor at the time of these events, testified that she called the victim after learning that the victim had cancelled her appointment for a new patient admission for the day. She found the victim "very evasive, very [cryptic]" and sensed that there was something wrong. She asked the victim to give her a sign if she needed help, and the victim said "maybe I'll go do the admission later today." Ms. Schaff determined that this was a communication that the victim needed help, and she told the victim that she was calling the police.

Officers responding to Jack Creech's garage said that the victim appeared "very scared" and was "black and blue." Officers noted that the victim had bruising to her eyes and her body, that her hair was in disarray, and that she had cuts to her body and a swollen lip. Officers photographed her injuries. Sergeant Goode testified that his patrol car video recording showed that he had, unknowingly, passed the Petitioner's vehicle as he was responding to this call. Sergeant Goode and other officers went to the Petitioner's father's house to look for the Petitioner, and found his car there, noting that the hood was still warm. When officers did not find the Petitioner present, they returned to the victim's house where Sergeant Goode found shattered glass, duct tape, and the knife that she described. Sergeant Goode issued a warrant for his arrest, and the Defendant turned himself into police custody ten days later.

The Petitioner testified that he lived with the victim and her daughter and that, at one time, both the water bill and the electric bill were in his name. He said the victim put the accounts in his name without his knowledge. The Petitioner said that when he left the residence before this incident, he had not officially moved out and all of his belongings were at the house. The Petitioner said that, before his shift, the victim and Ms. Walker came to the drop off point with his things and then he would proceed to the mine. At the time, the victim hugged him and kissed him and told him that she loved him and to be safe. He assumed that their argument was over, so he decided to go home after his shift.

When his shift ended at 2:00 a.m., he went to his father's house to wait until 8:00 a.m. The Petitioner said that he then went to the victim's house. He knocked on the bathroom door, and she said he could come in. The Petitioner went and lay down on the bed, and the victim sat on the bed working on her computer. There was a knock on the door, and the victim said it must be the man who cuts the grass. She told the Petitioner to get in the shower and that she would answer the door. He instead went to the door, where he saw Mr. Brantley. Upon the Petitioner's questioning, Mr. Brantley said that he had stayed the night with the victim and taken his daughter and the Petitioner's daughter to

6

school that morning. He was returning with breakfast for the victim. The Petitioner told Mr. Brantley to get a good look at him and not ever return.

The Petitioner said that he then returned to the house and found empty liquor bottles and beer cans in the trash. He was emotional and crying and arguing with the victim. The Petitioner said that he then began using profanity and called the victim a "whore." The victim became incensed and attempted to hit him with the vase, but the vase did not break. On her second attempt, the Petitioner grabbed the vase and hit the victim in the face, shattering the vase. The Petitioner said that they both became "hysterical" and that the victim began "throwing [and] scratching," so he "threw her around a little bit." The Petitioner denied using duct tape to bind the victim. The Petitioner said that he told the victim he was leaving and going to his father's house and would never return. He then left and went to his father's house.

The Petitioner identified photographs of items belonging to him that were still in the home. The Petitioner denied choking the victim or using a knife during the argument.

During cross-examination, the Petitioner said that he first learned of the charges against him from Facebook, and he became scared. He admitted texting the victim and expressing anger about the charges because they were untrue. The Petitioner admitted that he had been convicted of theft in Kentucky two years before this incident, and he gave his father's and not the victim's address as his home address.

Based upon this evidence, the jury convicted the Petitioner of one count of aggravated kidnapping and two counts of aggravated assault. The trial court sentenced him to sixteen years of confinement. The Petitioner appealed his convictions and sentences contending that the trial court erred when it denied a motion for mistrial based on a juror issue and when it imposed consecutive sentences. This court affirmed the Petitioner's convictions and sentences, and the Tennessee Supreme Court denied the Petitioner permission to appeal. *Hawkins*, 2016 WL 5210770, at *1.

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief in which he alleged that the State had failed to disclose exculpatory evidence before trial, namely the knife, duct tape, and broken glass, and that his trial counsel was ineffective for failing to properly communicate with him, including communicating a plea offer. The post-conviction court held a hearing during which the parties presented the following testimony: The Petitioner testified that he felt that his trial counsel ("Counsel") was ineffective for failing to communicate to him plea offers that the State made. The Petitioner said that Counsel told him that because of Counsel's work on the case, the Petitioner did not need to entertain

7

plea offers. Counsel said that the Petitioner did not "need to hear them [be]cause [Counsel was] gonna get [him] through this and then walk [the Petitioner] out of [jail]." The Petitioner said Counsel informed him that "he found [the Petitioner] innocent," and the jury would also.

The Petitioner said that he retained Counsel, who met him at the jail. The Petitioner remained in custody, and Counsel came to visit him in jail three or four times. One of those times was to review discovery, and Counsel provided the discovery to the Petitioner and then left it with him for two hours to look at it on his own. He said the discovery contained CDs that he had no way of watching. The Petitioner said that Counsel "sometimes" came to his court dates and sometimes did not.

The Petitioner admitted that he and the victim had an altercation that day and that he was "by no means . . . innocent." He said he had spent over five years in prison and had learned that he had made a mistake with his actions. He said, however, that considering the evidence contained in discovery that he would have "been a fool not to take a plea" offer. Further, had he been aware of what was contained within the discovery packet, including the knife and duct tape, he would not have gone to trial because it was embarrassing to his family and him. He would have entered a plea of guilty.

The Petitioner testified that, during trial, the State introduced a brown bag. He asked Counsel what it contained, and Counsel responded that he did not know. The Petitioner said that Counsel did not object. The bag contained the knife, duct tape, and broken glass. The Petitioner said that the jury looked in the bag, and he took from their faces that it was not good. The Petitioner was unsure whether Counsel later filed a motion raising the issue that the contents of the bag were not disclosed during discovery.

The Petitioner said that he and the victim corresponded through letters. She said she wanted to help get him released from prison because of his extensive sentence. She also asked him in her letters why he did not take the plea offer that the State had offered of six years, with the convictions being reduced to misdemeanors. She also said that the State had offered seven and eight year sentences as well. The Petitioner reiterated that, when he asked Counsel about plea offers, Counsel told him that he did not need to think about plea offers. The Petitioner said that he responded, "well . . . I'm not innocent" to which Counsel said, "[W]ell, I'm gonna prove you innocent."

During cross-examination, the Petitioner agreed that he was present at the scene when the altercation occurred. The Petitioner denied that his petition for post-conviction relief stated that he and Counsel had discussed two plea offers. He, however, clarified that he did not remember discussing any plea offer with Counsel. The Petitioner maintained that Counsel told him that he did not "need no plea" despite the Petitioner's

assertion to Counsel that he was "not innocent."

The Petitioner recalled that, the day before his trial, Counsel left him in the booking area "forever," meeting with him intermittently. He agreed that Counsel met with the Assistant District Attorney also and then came back and spoke with the Petitioner. When the Petitioner asked him what the Assistant District Attorney had said, Counsel responded, "nothing you want to hear, we're going to trial in the morning." The Petitioner said that this happened several times during the course of that day.

The Petitioner said that there was no duct tape involved during his altercation with the victim. He further asserted that he never used a knife and no glass was broken. He agreed that he and the victim had a "very bad – bad altercation that morning," but he could not explain why there was duct tape, a knife, and broken glass at the scene. The Petitioner said this evidence hurt his case and that Counsel never objected to its introduction.

The Petitioner said that Counsel gave him the discovery file but did not discuss it with him at length. Counsel told the Petitioner that he had a strong case. The Petitioner testified that Counsel told him that he was going to tear up the victim on the stand to which the Petitioner responded there was "no way you're going to beat this," and also "I'm not innocent completely." The Petitioner again said that he asked Counsel what the State had offered with regard to a plea agreement, and Counsel "shot [him] down" and would not say. The Petitioner said that Counsel told him that he had "won every case" that he had ever tried in that county.

During redirect examination, the Petitioner testified that the duct tape, the glass, and the knife were all items that they kept in their household regularly.

During recross-examination, the Petitioner reviewed the general sessions warrant from the defense file. He agreed that it mentioned the knife, the vase, and the duct tape. The warrant also contained the victim's allegation that the bottle was broken.

Judge Amanda Sammons testified that she was the prosecutor in this case in 2013 and 2014. She said that she and Counsel were in contact with each other about this case consistently from the time that the Petitioner turned himself in to law enforcement. Judge Sammons testified that there were pictures of the tangible evidence (the duct tape, the glass, and the knife) that she disclosed to the defense but that Counsel never asked to see those items. She herself never looked at the tangible evidence either, until it was introduced at trial.

Judge Sammons testified that she and Counsel engaged in plea negotiations in

November of 2013, six months after the Petitioner had turned himself in. Judge Sammons recalled that Counsel said that the Petitioner was confident that the case would not be prosecuted because he had been through domestic assault incidents with the victim several times previously. Judge Sammons identified her written plea offer in this case to a reduced charge of aggravated kidnapping, aggravated burglary, and domestic assault in exchange for a sentence of eight years, to be served at 85%. She said that this offer was rejected.

Judge Sammons said that she and Counsel continued to negotiate, and, in February 2014, she offered the Petitioner seven years, followed by five years of probation. That offer was rejected. Judge Sammons recalled that she at one point reconsidered the plea offer because the Petitioner had coerced the victim while he was on work release status.

Judge Sammons identified a letter dated December 30, 2013, in which she formalized her plea offer in this case to reduced charges of aggravated kidnapping, aggravated burglary, domestic assault, with a sentence of eight years, to be served at 85%. Judge Sammons testified that, after this plea offer was rejected, she offered seven years, followed by five years of probation. Judge Sammons met with Counsel in February 2014, and she informed him that the Petitioner had coerced the victim after being placed on work release status and that the victim was "terrified." She therefore told him that they were not close in plea negotiations, and Counsel acknowledged that he understood. The case went to trial the next month.

Judge Sammons recalled when the bag of evidence was admitted during the trial through Sergeant Goode. She said that the sergeant opened the bag and retrieved items, namely the knife, the broken glass, and a roll of unused duct tape. While she knew what the bag contained, she had not specifically viewed the items before trial. She recalled that Counsel objected, and she informed him that she had provided him with pictures of the evidence. Counsel said that as long as he had received pictures of the evidence then it was "okay." Counsel made no further objection to the introduction of the evidence.

During cross-examination, Judge Sammons testified that the victim's main concern was that the Petitioner not be released until after I.R. graduated from high school in 2018. She said that she never offered the Petitioner six years to be served at thirty percent. She was confident that she never offered less than seven years, which was conditioned upon the Petitioner also serving a subsequent five years of probation.

The Petitioner released the victim from subpoena to testify, informing the post-conviction court that her testimony would comport with her affidavit attached to the post-conviction petition. In her affidavit, the victim swore that she remembered discussing with Judge Sammons three different plea offers, including one offer for six or seven

10

years. She did not recall the exact percentage of service of this sentence. Judge Sammons told her that the Petitioner declined all three plea offers. After the Petitioner was convicted and incarcerated, the victim contacted him and asked why he did not take the plea offer of six or seven years.

Counsel testified that he worked with the Petitioner to arrange for the Petitioner's surrender to face these charges. Counsel identified the warrant in this case, which discussed the victim being restrained and getting free, grabbing a glass bottle and attempting to hit the Petitioner with the bottle. The warrant further included that the Petitioner took the bottle from the victim and hit her in the head with it, causing her to lose consciousness. He said he was aware that there were allegations about a glass vase and a knife. That said, the State never specifically notified him of the duct tape or broken glass. Counsel said that he had photographs of everything listed in discovery, including a photograph of the knife, so he believed that viewing any tangible evidence was unnecessary.

Counsel recalled the February meeting with Judge Sammons when they discussed an offer in this case. He said that he would meet with her and then go to the jail to see the Petitioner and discuss the offer. He went back and forth several times and each time he wrote the details of the offers on a yellow legal pad. Counsel said that the State's final position was eight years to be served at 100%. The Petitioner countered to enter a guilty plea in exchange for eight years to be served at 30%. Counsel said that the Petitioner rejected the State's offer.

Counsel said that their trial strategy was to assert that the charges were "overblown" and that a lot of the allegations did not occur. He said that, in his opening, he discussed that there was no duct tape or glass that would be introduced into evidence. He also used prior inconsistent statements by the witnesses to impeach their credibility. He said, however, that if he had known about the duct tape and broken glass it "very potentially could have changed his advice" to the Petitioner about whether to plead guilty.

Counsel compared the moment that the State brought out the bag containing the duct tape and broken glass with a "dream" where you have "missed a final exam." Counsel said that he objected to the introduction of the evidence and Judge Sammons said that he had photographs of everything contained in the bag. Believing that the State was being honest, Counsel turned to look through his file box to confirm that he missed pictures of this evidence, and, as he did so, the evidence was being passed to the jury. He said that the jury saw a Walmart bag containing broken glass and duct tape. At that point, Counsel changed his trial strategy and omitted any mention of missing evidence. He, however, felt that he lost credibility with the jury at this point.

11

Counsel said that he looked through the pictures provided to him and discovered that the State had given him a photograph of the Walmart bag tied in a knot. The photograph did not depict broken glass or used duct tape. Counsel agreed that the record did not support his contention that there was used duct tape in the Walmart bag, and the record evinced only that an unused roll of duct tape was entered, but he said that he had a recollection of a juror's hands getting stuck to the duct tape. Counsel said that he brought up the issue of the failure to disclose the evidence in a judgment of acquittal and on appeal, but neither court sided with Counsel, and the appellate court held that he had waived the issue.

During cross-examination, Counsel testified that he liked the Petitioner and did not believe that he belonged in prison. Counsel said that it was untrue that he never discussed any plea offer with the Petitioner and that he did discuss the offers with the Petitioner. He said that it was also untrue that he only met with the Petitioner on three occasions. The two also went over "every single page of" the discovery file together.

Based upon this evidence, the post-conviction court found:

Reviewing the issues, I've – before argument was made, I attempted to lay them out as best I could see them. Number one, we're talking about the effect that the undisputed discoverable items would have had on this trial and [Counsel's] response upon seeing them in the Courtroom. I think there was some dispute with the trial transcript. The trial transcript says that apparently, I asked [Counsel] if he had an objection, and his response was, well, if they were in a photograph, I must have known about them. And I suppose logically, he felt he had no objection for lack of knowledge. Now -- and I haven't seen the photograph here today, but I'm guessing the contents of that bag were not photographed? [Both parties then confirmed this was correct.]

Okay. So, what was in it was still in dispute, or at least undiscovered. That is -- and I think [Counsel] acknowledges that is . . . an error on his part. The question then -- applying the *Strickland* standard to this particular set of facts and testimony, we have, number one, that there was ineffective assistance; and number two, that this ineffectiveness, had it been different, would have changed the outcome of the trial.

Now, I'm gonna break the analysis in half. One is gonna deal with discoverable information, the second is the failure to convey offers as claimed by the [P]etitioner. And I will note that the [P]etitioner -- the

12

petition itself, that the [P]etitioner has agreed to claims that there were two offers made to him; however, on the stand today, he claims there were no offers and that [Counsel] sought to change his -- change the [P]etitioner's mindset away from the entire process of guilty plea, and let's go to trial - quote, "let's go to trial." There was no ambivalence by the [Petitioner], nor [Counsel]. If you listen to all of that, it was a very straightforward philosophy that [Counsel] had from the beginning. Today on the -- here on the stand, it's very clear that it was an active negotiation toward settling this case. Judge Sammons, active negotiation in settling the case. The terms of the resolution in my mind are irrelevant. The question becomes, if you take the sworn testimony offered by the [P]etitioner against the testimony that was presented through Judge Sammons and [Counsel], widely diverse, irreconcilable, and . . . I'm gonna give the credence to Judge Sammons and [Counsel] because the . . . [P]etitioner refuted his own complaint or petition here today. He says there were no offers made when, in fact -- well, in his petition, he says there were two. So the number is less relevant than the -- than what actually occurred. I wasn't there, of course, I don't know the back and forth, but the scenario laid out by the lawyers in this case is much more credible than that of, no, we are not going to trial. And in fact, the letter sent to [Counsel] from Judge Sammons with the offer shows that there was an active negotiation. So the [P]etitioner's averment that -- here today -- this testimony here today that there were no negotiations is incredible, and it affects his credibility throughout the entire portion of this.

So I think what we're left is, we are left with determining the effect that this discoverable - the bag of things, what it had on the jury. I think Judge Sammons mentioned that there was some effect that the jury had when it was presented. I don't recall that. But, there is no showing here today how that, in and of itself, had that been -- had an objection been made and sustained based on the failure to provide prior to trial, how that would have affected the outcome, how this jury would have been different. It might have changed the plea negotiation strategy if you, you know, believe the [P]etitioner, but I think that's – that's well beyond – at that point, the plea negotiation issues were irrelevant because we were -- we were at the shank of trial.

So, based on the petition filed today, based upon the testimony offered by the [P]etitioner including that of the [P]etitioner himself, counsel – trial counsel, . . . Amanda Sammons, the Assistant District Attorney General handling the case, I'm gonna find that there has been a failure to show there is an ineffective assistance of counsel, that the complaints being

13

made primarily address, I suppose, a rethinking of what the [Petitioner] may have taken had he been -- had he had the chance to replead this. I commend him for his efforts in the prison system, whatever is working for him is good, but it is simply too late to renegotiate this case and particularly after all the proof has come in. I have reviewed the Court of Criminal Appeals Opinion as we've been going through this looking for issues that had already been litigated. . . . I am finding that the witnesses – the credibility falls in favor of the State's position as filed in the response, and that the petition for post-conviction relief is overruled.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner asserts that: (1) the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 93 (1965); (2) Counsel was ineffective for failing to investigate or communicate effectively with him; and (3) the cumulative effect of these errors entitles him to a new trial.

## A. Exculpatory Evidence

The Petitioner contends that the State violated *Brady v. Maryland,* 373 U.S. 93 (1965) when it failed to disclose to him the contents of the brown paper bag that was admitted during the trial. He notes that the State's initial discovery response failed to list the roll of duct tape, pieces of duct tape, broken glass, or anything related to the plastic grocery bag collected from the victim's home. He contends the failure to disclose this evidence constituted a discovery violation. The State counters the Petitioner waived any right to assert a *Brady* claim and that regardless of this waiver he cannot establish the necessary elements of a *Brady* violation. The State asserts that the Petitioner failed to raise the *Brady* issue during his direct appeal, which results in waiver when a petitioner is aware of the issue before the end of the trial. The State further avers that the Petitioner cannot show that he filed a motion for discovery requesting this evidence or that the evidence is "obviously exculpatory," two necessary elements for him to be entitled to relief. We agree with the State.

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to establish a *Brady* claim, a defendant must establish the following:

14

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).

Evidence is "favorable" if it is deemed to be exculpatory in nature or could be used to impeach the State's witnesses. *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). "'[E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness'" falls within the *Brady* disclosure requirement. *State v. Jackson*, 444 S.W.3d 554, 593 (Tenn. 2014) (quoting *Johnson*, 38 S.W.3d at 56-57). The State's duty to disclose extends to all favorable evidence regardless of whether the evidence is admissible at trial. *Brady*, 373 U.S. at 87. *Brady* applies to both evidence in the prosecution's file and "any favorable evidence known to others acting on the government's behalf in the case, including the police." *Jackson*, 444 S.W.3d at 594 (citations omitted). The State's duty to disclose does not extend to information the defendant already possesses or is able to obtain or to information not in the possession of the prosecution or another governmental agency. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Accordingly, a "reasonable probability" of a different result is established when "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Whether a petitioner is entitled to a new trial based upon a *Brady* violation "presents a mixed question of law and fact." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). The lower court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are

reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. The lower court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness. *Id.*

Turning to the case at issue, there is no proof that the evidence about which the Petitioner complains was favorable to him. He, in fact, asserts the opposite, contending that if he had known the State had this evidence that corroborated the State's theory of the case then he would have been more likely to enter a plea of guilty. *Brady* is designed to protect a defendant from the State's non-disclosure of exculpatory evidence. The Petitioner is not entitled to relief.

## B. Ineffective Assistance of Counsel

The Petitioner next contends that Counsel was ineffective for failing to investigate the physical evidence, including the contents of the brown paper bag, and that this failure prejudiced the Petitioner because it prevented him from filing appropriate pretrial motions, hindered plea negotiations, and hurt Counsel's trial strategy. He next contends that Counsel failed to communicate plea offers to him. The State counters that the Petitioner has waived the claim that Counsel should have filed a discovery request for the physical evidence and, further, if not waived, the Petitioner's claim fails because he did not question Counsel at the post-conviction hearing regarding whether it was a strategic decision not to file a discovery request. The State further avers that the post-conviction court found credible Counsel's testimony that he communicated all plea offers to the Petitioner.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

16

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally

17

compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

Turning to the case under submission, we first conclude that Counsel's failure to investigate the contents of the brown paper bag did not prejudice the Petitioner. The contents, all of which were mentioned in the affidavit of complaint, included duct tape, broken glass in a plastic bag, and a knife. We cannot conclude that, had Counsel investigated further, the outcome of the trial would have been different. The Petitioner, who was present during the altercation and knew what transpired, was aware that the affidavit of complaint listed each of these pieces of evidence. He testified at trial about each of these pieces of evidence, explaining why they were present at the scene. The Petitioner's assertion that, had he known that the State intended to offer the broken glass, knife, and duct tape as physical evidence, he would have entered a plea of guilty does not prove that he was prejudiced. Counsel's advice regarding the guilty plea only "potentially" would have changed had he been aware of this evidence. We agree with the post-conviction court that the Petitioner has not proven that he is entitled to relief.

We further conclude that the Petitioner is not entitled to relief based on Counsel's failure to object to the admission of this evidence. The Petitioner cannot prove that, even if Counsel made an objection and the trial court granted the objection, that the result of the proceedings would have been different. The evidence included multiple witnesses' testimony regarding the assault, physical evidence confirming the victim's account, and the Petitioner's own inculpatory testimony. The Petitioner is not entitled to relief as to this issue.

Finally, we conclude that the post-conviction court made a credibility determination when it found that Counsel had relayed the plea offers to the Petitioner. As

18

previously stated, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *See Momon*, 18 S.W.3d at 156. We conclude that the Petitioner is not entitled to relief.

Finally, addressing the Petitioner's contention that cumulative error entitles him to relief, the cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial. *State v. H.R. Hester*, 324 S.W.3d 1, 76 (2010); *see also State v. Clark*, 452 S.W.3d 268, 299 (Tenn. 2014) ("The cumulative error doctrine embodies the idea that a multiplicity of errors—though individually harmless—may in the aggregate violate a defendant's due process right to a fair trial."). "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Hester*, 324 S.W.3d at 77. Because we have concluded that there are not multiple errors, the doctrine of cumulative error is inapplicable. *Id.*

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

19